**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**WILLIAM F. SHEA, LLC, et al.,**

       **Plaintiffs,**

                                   **Case No. 2:10-cv-615**
                                   **JUDGE GREGORY L. FROST**
      **v.**                              **Magistrate Judge Norah McCann King**

**BONUTTI RESEARCH, INC., et al.,**

       **Defendants.**

**<u>OPINION AND ORDER</u>**

This matter is before the Court for consideration of Defendants Peter M. Bonutti, M.D.,

Unity Ultrasonic Fixation, LLC, the Bonutti 2003 Trust, Joint Active Systems, Inc., and

MarcTec, LLC's ("Moving Defendants") Motion to Dismiss (Doc. # 11), the Memorandum of

Plaintiffs William F. Shea, LLC and Avon Equity Holdings, LLC ("Plaintiffs") in Opposition to

the Moving Defendants' Motion to Dismiss (Doc. # 32), the Reply Brief of the Moving

Defendants in Support of their Motion to Dismiss for Lack of Personal Jurisdiction (Doc. # 36),

and Plaintiffs' Surreply in Opposition to Defendants' Motion to Dismiss[1] (Doc. # 40).  For the

reasons that follow, the Court **GRANTS** the Moving Defendants' Motion to Dismiss.

**I.  Background**

Peter M. Bonutti, M.D., is an orthopedic surgeon and inventor.  Dr. Bonutti was raised in

---

[1]The Court granted Plaintiffs' request to file this surreply, finding that the Moving
Defendants had raised new arguments in their reply memorandum related to a contract referred
to as "the Unity Operating Agreement."  (Doc. # 39.)  However, because the Court concludes
herein that the Moving Defendants are entitled to dismissal of the claims against them without
consideration of the this new argument, it was unnecessary to consider the parties' arguments
related to the Unity Operating Agreement.

Ohio and has lived in Florida and Illinois for the past 21 years.  He is registered to vote in

Florida and carries a Florida driver's license.  His medical practice, Bonutti Clinic, is located in

Effingham, Illinois.  Dr. Bonutti has pioneered various types of orthopedic products, including

minimally invasive total knee replacements.  Dr. Bonutti formed Bonutti Research Inc. ("BRI"),

a corporation organized under the laws of Delaware with its principal place of business in

Illinois, to assist in the development, manufacture, and distribution of Dr. Bonutti's technology.

Dr. Bonutti is the president and chief operating officer ("CEO") of BRI.

In 2003, BRI entered into a Consultant Agreement with William F. Shea LLC

("Shea LLC").  BRI hired Shea LLC and its principal William F. Shea to act as its

business advisor; to help BRI find and develop opportunities to license its technology to

manufacturers of orthopedic devices; and to grow BRI's intellectual property, ideas,

technologies, and business concepts.  The Consultant Agreement was terminated on

approximately October 26, 2007.

During the course of his personal and professional endeavors, Dr. Bonutti has formed

various other entities.  Four of these entities and Dr. Bonutti are the Moving Defendants in the

instant action.

Unity Ultrasonic Fixation LLC ("Unity"), a limited liability company organized

under the laws of Delaware with its principal place of business in Illinois, develops ultrasonic

bonding technology.  Dr. Bonutti is Unity's CEO and President.  Dr. Bonutti is the holder of at

least 66% of the membership interest and may unilaterally make major decisions concerning

Unity, including entering into contracts, forming partnerships, terminating the employment of

any member, setting members' compensation levels, licensing the company's assets, and

amending the LLC agreement.

Joint Active Systems Inc. ("JAS") is an Illinois corporation that manufactures and distributes range-of-motion products. Dr. Bonutti owns 75% of JAS and his brother Boris owns 25%. Dr. Bonutti is the CEO of JAS and Dr. Bonutti and Boris are the directors of JAS.

Dr. Bonutti established a family trust, referred to as the Bonutti 2003 Trust ("the Bonutti Trust"). Dr. Bonutti is the trustee of the Bonutti Trust.

MarcTec LLC ("MarcTec") is a limited liability company organized under the laws of Illinois with its principal place of business in Illinois. It is a patent holding company. Bonutti Holding, LLC owns 85% of MarcTec and Dr. Bonutti's brother, Boris, owns 15%. Dr. Bonutti is the CEO and sole director and his brother Boris is the chief operating officer.

On June 7, 2010, Plaintiffs filed this action in the Franklin County, Ohio Court of Common Pleas, seeking royalty fees purportedly owed to Shea LLC under the Consultant Agreement and seeking to have Avon Equity Holding LLC's allegedly wrongfully terminated interest in Unity restored or compensated. (Doc. # 3.) Specifically, Plaintiffs filed claims for breach of contract, breach of fiduciary duty, and unjust enrichment. Defendants removed the case to this Court based on diversity jurisdiction. (Doc. # 2.) BRI answered the complaint and counterclaimed against Shea LLC, William Shea, and Hawk Healthcare LLC (another Shea affiliate) for breach of fiduciary duty and breach of contract. (Doc. # 9.)

On September 8, 2010, Magistrate Judge Norah McCann King held a preliminary pretrial conference in this matter. (Doc. # 19.) The Magistrate Judge permitted the parties three months in which to engage in jurisdiction-related discovery. That discovery was completed on November 8, 2010, and Plaintiffs filed their memorandum in opposition to the Moving

Defendants' Motion to Dismiss on November 12, 2010.  The Moving Defendants' Motion to Dismiss is now ripe for review.

## II.  Standard

When confronted with a motion filed under Rule 12(b)(2) of the Federal Rules of Civil Procedure, "[t]he plaintiff bears the burden of establishing the existence of jurisdiction." *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008) (citing *Brunner v. Hampson*, 441 F.3d 457, 462 (6th Cir. 2006)).  If the district court decides a Rule 12(b)(2) motion prior to trial "it has the discretion to adopt any of the following courses of action: (1) determine the motions based on affidavits alone; (2) permit discovery, which would aid in resolution of the motion; or (3) conduct an evidentiary hearing on the merits of the motion." *Intera Corp. v. Henderson*, 428 F.3d 605, 614 n.7 (6th Cir. 2005) (quoting *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir.1989)).

If the court conducts an evidentiary hearing on the issue of personal jurisdiction, the plaintiff "must establish jurisdiction by a preponderance of the evidence." *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003) (citing *Serras*, 875 F.2d at 1214).  When a court resolves a Rule 12(b)(2) motion based on "written submission and affidavits . . . rather than resolving the motion after an evidentiary hearing or limited discovery, the burden on the plaintiff is 'relatively slight,' . . . and 'the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal.' " *Air Prods. and Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (quoting *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988)).  Similarly, even if there has been discovery, as there has been in the instant action, in the absence of an evidentiary hearing a court will generally apply a *prima facie* standard

weighing the evidence in the light most favorable to the plaintiff. *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998). The *prima facie* standard "loses some of its significance, however, where . . . the plaintiff has received all of the discovery it sought with respect to personal jurisdiction and there does not appear to be any real dispute over the facts relating to jurisdiction." *Int'l Tech. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 391 (6th Cir. 1997); *see also Dean*, 134 F.3d at 1272 ("[W]e would not use [the *prima facie*] standard if the reason for not having an evidentiary hearing was that there was no 'real dispute' as to the facts or to the extent of discovery.").

### III. Discussion

The Moving Defendants move to dismiss all claims filed against them for lack of personal jurisdiction.

### A. The Consultant Agreement

The Consultant Agreement contains a forum selection clause that provides:

> All actions brought to interpret or enforce any provision of this Agreement shall be brought in the courts located in the federal or state courts located in Columbus, Ohio and each party agrees to waive any defense or claim of lack of personal jurisdiction . . . .

(Doc. # 34 at 14.)

Plaintiffs argue that the Moving Defendants are subject to the forum selection clause either because (1) Dr. Bonutti, JAS, Unity, and the Bonutti Trust agreed to its application by signing the Consultant Agreement and MarcTec should have been required to sign the Agreement, or (2) the alter ego theory permits the Court to exercise personal jurisdiction over them, or (3) they are third party beneficiaries of, or closely related to the parties of, the Consultant Agreement; or (4) as to MarcTec only, it is bound to the forum selection clause by

5

equitable estoppel.

Initially, the Court notes that personal jurisdiction is a waivable right.  *Burger King Corp. v. Rudzwicz*, 471 U.S. 462, 472, n. 14 (1985); *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703-04 (1982).  "The use of a forum selection clause is one way in which contracting parties may agree in advance to submit to the jurisdiction of a particular court." *Preferred Capital, Inc. v. Assocs. in Urology*, 453 F.3d 718, 721 (6th Cir. 2006) (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)).

### 1. Assenting to be Bound by the Forum Selection Clause

Plaintiffs contend that all of the Moving Defendants agreed to waive any defense or claim of lack of personal jurisdiction under the forum selection clause, paragraph 20, of the Consultant Agreement.

### a. Dr. Bonutti, JAS, Unity, and the Bonutti Trust

Dr. Bonutti, JAS, Unity, and the Bonutti Trust argue that they did not agree to waive their right to object to personal jurisdiction because they unequivocally indicated that they were bound only by specific provisions in the Consultant Agreement and that the forum selection clause was not one of those provisions.  This Court agrees.

The plain language of the Consultant Agreement unambiguously indicates that the only parties subject to the entire Agreement were Shea LLC and BRI.  The first sentence of the Consultant Agreement states:

> THIS CONSULTANT AGREEMENT (the "Agreement") is made and entered into this 21st day of August 2003 and entered into by and between WILLIAM F. SHEA, LLC ("Consultant") and BONUTTI RESEARCH, INC. ("BRI") with an effective date of March 1, 2002 (the "Effective Date").

(Doc. # 34 at 1) (emphases in original).  Both of these parties assented to the Consultant

Agreement with their representatives' signatures on the signature page of the Agreement.

 The plain language of the Consultant Agreement also unambiguously indicates that Dr. Bonutti, JAS, Unity, and the Bonutti Trust were subject to only two or three specific provisions, none of which contain the forum selection clause:

> The undersigned, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby execute this Agreement for the sole purpose of agreeing to be bound by the terms of Section 7, 8, and 12 (except for Peter M. Bonutti who is agreeing to be bound by Sections 7 and 8 only) of this Agreement.

*Id.* at 16.  Under that statement are the signature lines for Dr. Bonutti, which he signed, and the signature lines for JAS, Unity, and the Bonutti Trust, which Dr. Bonutti signed in his representative capacity for each of these entities.

Under the law of the state of Delaware, which Plaintiffs contend applies to the interpretation of the Consultant Agreement,[2] a contract's "[c]lear and unambiguous language . . . should be given its ordinary and usual meaning."  *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008) (omission in original) (citations omitted).  As the Delaware Supreme Court explained:

> Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it.  When the language of a . . . contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented.

*Id.* (citations omitted).

The Consultant Agreement clearly and unambiguously states that JAS, Unity, and the

---

[2]The Consultant Agreement contains a choice of law provision indicating that the law of Delaware will govern any disputes as to the Agreement.  Plaintiffs assert that the law of Delaware should govern the Consultant Agreement's application to the Moving Defendants, as well as its application to Shea LLC and BRI.  Defendants do not contest the application of Delaware law for the purpose of determining whether this Court possesses personal jurisdiction over the Moving Defendants. The Court shall, therefore, apply the law of the state of Delaware.

Bonutti Trust executed the Agreement for the "sole purpose" of being bound by Sections 7, 8, and 12 and that Dr. Bonutti executed it for the "sole purpose" of being bound by Sections 7 and 8 "only." There is nothing ambiguous about the word "sole," as a Delaware Superior Court has explained:

> The common dictionary meaning of the word "sole" is clear and unambiguous. It is defined as "having no sharer," "being the only one," "functioning independently and without assistance or interference," and "belonging exclusively or otherwise limited to one usually specified individual, unit, or group." "Solely" is defined as "without another," "singly," and "to the exclusion of all else." Webster's New Collegiate Dictionary.

*James v. Getty Oil Co. (Eastern Operations), Inc.*, 472 A.2d 33, 39 (Del. Super. Ct. 1984) (finding that the meaning of the word "solely" in a contract was "crystal clear and unequivocal").

> Plaintiffs, however, argue:

> A more plausible reading of the 'sole purpose' language is that the parties included it to make clear that the [Moving] Defendants were not agreeing to take on any direct obligation to pay Shea LLC (under § 3 of the Agreement), or any of the attendant duties that were placed on BRI alone. In other words, the signature page confirmed the arrangement whereby BRI became the agent for the Bonutti Group [*i.e.*, Dr. Bonutti, JAS, Unity, and the Bonutti Trust] and took on the primary payment obligation while the other Bonutti Group members essentially guaranteed BRI's payments. The parties did not intend the "sole purpose" language to exempt the [Moving] Defendants from all of the Consultant Agreement's miscellaneous provisions, such as the definitions, the choice-of-law provision, and the forum selection clause. The [Moving] Defendants, just like BRI and Shea LLC, consented to and are bound by the forum selection clause.

(Doc. # 32. at 23-24.) This explanation twists the contract language under the guise of construing it. There is no dispute that the sixteen-page Consultant Agreement was negotiated by sophisticated counsel. If the parties did not wish to limit the reach of the Consultant Agreement related to Dr. Bonutti, JAS, Unity, and the Bonutti Trust, they should not have so indicated in the clear language of the Agreement.

8

Additionally, the Court's interpretation of the plain language is consistent with the Consultant Agreement as a whole.  That is, the Agreement specifically states that it was made between Shea LLC and BRI and the signature page expressly identifies only Shea LLC and BRI as "the parties."  Dr. Bonutti, JAS, Unity, and the Bonutti Trust signed under a separate heading, which does not identify them as "parties."  Throughout the Agreement the term "parties" is consistently used to refer only to Shea LLC and BRI, whereas it is not used to refer to any of the Moving Defendants.  Instead, the Agreement created a defined term, the "Bonutti Group," to refer to Unity, JAS, the Bonutti Trust, and Dr. Bonutti.  And while paragraph 8 of the Agreement authorizes BRI to waive rights on behalf of the Bonutti Group, BRI expressly states that even though it possesses the power to waive the Bonutti Group's right to object to their personal jurisdiction in this Court, it has never done so.

Accordingly, the Court concludes that Dr. Bonutti, JAS, Unity, and the Bonutti Trust are not subject to the forum selection clause in the Consultant Agreement by virtue of their agreement to be bound by specific sections of the Agreement.

### b.  MarcTec

Plaintiffs argue that even though MarcTec was not in existence at the time of the execution of the Consultant Agreement, it should nonetheless be subject to its forum selection clause based upon other provisions in the Agreement that required it to be a signatory to the Agreement:

> However, MarcTec is a Bonutti Affiliate because it is owned and controlled "either directly or indirectly" by Bonutti (Consultant Agreement § 1, Ex. 1 to Shea Decl.). MarcTec was a party to projects and transactions under the Consultant Agreement. (*See, e.g.*, Ex. 3 to Shea Decl.).  Therefore, BRI was required to "cause [MarcTec] to execute a counterpart signature page to this Agreement . . . ."  (Consultant Agreement § 7, Ex. 1 to Shea Decl.).

9

(Doc. # 32 at 26.)  This Court disagrees.

Section 7 to the Consultant Agreement, upon which Plaintiffs rely, requires "any Bonutti Affiliate who was a party to a Consummated Project to execute a counterpart signature page to [the Consultant] Agreement" so that it would become "jointly and severally liable with BRI for any Project Transaction Fee owed to Consultant for a Consummated Project . . . ."  (Doc. # 34 at 7-8.)  Assuming *arguendo* that MarcTec is a "Bonutti Affiliate" for purposes of the Consultant Agreement, Section 7 does not support the proposition that BRI was required to secure MarcTec as a party to the entire Consultant Agreement.  Section 7 is clearly limited to liability on a particular project.  Therefore, Plaintiffs' argument is without merit.

## 2.  Third Party Beneficiary and/or Closely Related Doctrines

Plaintiffs argue that even if the Court determines that the Moving Defendants are not bound by the forum selection clause as a matter of contract interpretation, this Court may still properly exercise personal jurisdiction over the Moving Defendants based upon the third party beneficiary and/or closely related doctrines.  Plaintiffs rely on *Hadley v. Shaffer*, No. 99-144-JJF, 2003 U.S. Dist. LEXIS 14106, at *13, 14, 18 (D. Del Aug. 12, 2003), which states that a non-signatory to a contract may qualify as a third-party beneficiary or a closely related entity if "the contract was 'made for the benefit of that third party within the intent and contemplation of the contracting parties' " or the nonsignatories "are closely related to the contractual relation or [they] should have foreseen governance by the clause."

Here, Dr. Bonutti, JAS, Unity, and the Bonutti Trust do not qualify as third party beneficiaries because they were not non-signatories to the Consultant Agreement.  Instead, they signed "for the sole purpose of agreeing to be bound" by specific sections of the Consultant

Agreement.  Neither could these defendants have foreseen governance by the forum selection clause, a provision they expressly excluded from their agreement with Plaintiffs, which prevents them from being bound by the closely related doctrine.

As to MarcTec, it was not in existence at the time the Consultant Agreement was executed.  Consequently, the Consultant Agreement could not have been made for the benefit of MarcTec and within the intent and contemplation of BRI and Shea LLC.  Nor could MarcTec have foreseen governance by the forum selection clause.  Therefore, MarcTec is not subject to the forum selection clause by virtue being a third party beneficiary or closely related to the contractual relation between BRI and Shea LLC.

### 3. `Alter Ego Theory

Plaintiffs argue that the alter ego theory provides a mechanism by which this Court can exercise personal jurisdiction over the Moving Defendants.  Specifically, Plaintiffs contend that the Moving Defendants are so closely intertwined with BRI that it would be proper to exercise personal jurisdiction over them based upon BRI's significant contacts with Ohio.  The Court, however, is not exercising personal jurisdiction over BRI based upon any contacts it may have with Ohio, but rather based upon BRI's agreement to personal jurisdiction in Ohio pursuant to the forum selection clause in the Consultant Agreement.  Thus, to the extent that the alter ego theory applies here, it would be based upon BRI's agreement to personal jurisdiction in Ohio. *See Tech. & Serv., Inc. v. TACS automation, LLC*, No. 2:09-cv-1113, 2010 U.S. Dist. LEXIS 81496 (S.D. Ohio June 29, 2010) (applying the alter ego theory where personal jurisdiction was based upon a forum selection clause in a contract).

The parties correctly argue that this Court must look to Ohio law "[i]n applying the

alter-ego theory of personal jurisdiction in [a] diversity action." *Estate of Thomson*, 545 F.3d at

362.  Alter ego liability "has historical antecedents in both federal and state law." *Id.*  As a

general rule, " '[a] corporation is a legal entity, apart from [those] who compose it.' " *Transition*

*Healthcare Assocs., Inc. v. Tri-State Health Investors, LLC*, 306 Fed. Appx. 273, 280 (6th Cir.

2009) (quoting *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Co.*, 67 Ohio St.3d 274, 287

(Ohio 1993)).  Nevertheless, in extraordinary cases . . . courts will pierce the corporate veil and

disregard the corporate entity." *Corrigan v. United States Steel Corp.*, 478 F.3d 718, 724 (6th

Cir. 2007) (citing *United States v. Bestfoods*, 524 U.S. 51, 62 (1998)).  The alter ego theory was

originally used in the parent-subsidiary context or to reach the individuals who were in control of

a corporation.  *See Chicago, M. & St. P. Ry. Co. v. Minneapolis Civic & Commerce Ass'n*, 247

U.S. 490, 501 (1918) (when a corporation exists solely for the purpose of serving as an alter ego

for its owners, "the courts will not permit themselves to be blinded or deceived by mere forms or

law but, regardless of fictions, will deal with the substance of the transaction involved as if the

corporate agency did not exist and as the justice of the case may require").  However, the Sixth

Circuit has applied it outside of these contexts.  *See Flynn v. Greg Anthony Const. Co., Inc.*, 95

F. App'x 726, 734-38 (6th Cir. 2003) (applying in the context of three separate companies that

had one individual who was the president and treasurer of all three companies, and concluding

that "mere reference to Demis's role as an officer in each company is insufficient for establishing

a *prima facie* case of alter-ego liability").

> The Court may disregard the corporate form when:
>
> (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act . . . and (3) injury or unjust loss resulted to the plaintiff from

such control and wrong.

*Belvedere*, 67 Ohio St.3d at 275.  The first element of this test requires that plaintiff 'show that the individual and the corporation are fundamentally indistinguishable.' "  *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir. 2005) (quoting *Belvedere*, 67 Ohio St.3d at 288).  In analyzing the second prong, Ohio Courts consider several relevant factors:

> (1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s).

*LeRoux's Billyle Supper Club v. Ma*, 77 Ohio App. 3d 417 (Ohio Ct. App. 1991); *see also Taylor Steel*, 417 F.3d at 605 (applying the same factors).  The Sixth Circuit has suggested additional alter ego factors including sharing employees and officers; engaging in the same business enterprise; sharing an address or phone lines; using the same assets; performing the same tasks; failure to maintain separate books, tax returns and financial statements; and controlling the daily affairs of another corporation.  *Estate of Thomson*, 545 F.3d at 362-63.

In the instant action, Plaintiffs argue that the Moving Defendants meet some of these additional factors, such as sharing a common address and sharing officers.  Plaintiffs further claim that the entities entered into the Consultant Agreement as a group and that they were intended beneficiaries of the Agreement.  These facts, even if all are accepted as true, are insufficient to pierce the corporate veil and disregard the corporate entities involved here. Plaintiffs offer no evidence, or even any argument, that the Moving Defendants' control over BRI is such that BRI has no separate mind, will, or existence of its own; that the Moving Defendants' control over BRI is exercised in such a was as to commit a fraud or an illegal act,

13

*i.e.*, Plaintiffs make no argument that BRI is inadequately capitalized, disregards corporate formalities, or fails to keep corporate records; or that Plaintiffs were harmed as a result of the Moving Defendants' alleged control over BRI or their wrongs committed in creating the facade that BRI is a separate entity.  Consequently, Plaintiffs are not entitled to rely upon the alter ego theory as the basis for personal jurisdiction over the Moving Defendants.

### 4.  MarcTec and Equitable Estoppel

Plaintiffs contend that this Court may exercise personal jurisdiction over MarcTec based on the theory of equitable estoppel.  Plaintiffs' argument in its entirety states:

> In addition, because MarcTec was a party to projects and transactions and accepted benefits from them, MarcTec is bound to the forum selection clause by equitable estoppel.  "The doctrine of equitable estoppel prevents a non-signatory to a contract from embracing the contract, and then turning her back on the portions of the contract, such as a forum selection clause, that she finds distasteful." *Capital Group* [*Co., Inc. v. Armour*], [No. 422-N,] 2004 Del. Ch. LEXIS 159, at *26 [(Del. Ch. Oct. 29, 2004).

(Doc. # 32 at 21.)  Plaintiffs' argument is not well taken.

As the case to which Plaintiffs cite explains, the doctrine of equitable estoppel prevents a nonsignatory to a contract from avoiding the burdens of the contract when he has claimed a direct benefit of the contract.  *See generally Capital Group,* 2004 Del. Ch. LEXIS 159.  *Capital Group* relies upon *International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000) for the proposition that a nonsignatory must receive a direct benefit from the contract that contains the forum selection clause.  The *International Paper* court explained that International Paper was estopped from refusing to be bound by the forum selection clause because the contract containing it "provides part of the factual foundation for every claim asserted by International Paper."  *Id.* at 418.

14

Here, MarcTec is not claiming that the Consultant Agreement is the basis of a benefit it is due and then attempting to obtain that benefit while simultaneously denying its subjection to an additional provision within the Agreement.  Plaintiffs offer no argument at all as to why they believe MarcTec is claiming a benefit of the nature referred to under this doctrine as a direct benefit.  Consequently, the Court finds that the doctrine of equitable estoppel does not operate to subject MarcTec to the forum selection clause contained in the Consultant Agreement.

## B.  Personal Jurisdiction

"A Federal district court sitting in diversity must apply the law of the forum state to determine whether it may exercise jurisdiction over the person of a non-resident defendant." *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991) (citing *Welsh v. Gibbs*, 631 F.2d 436, 439 (6th Cir. 1980) and *In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 224 (6th Cir. 1972)).  However, constitutional concerns of due process limit the application of this law.  *Id.* (citing *Welsh*, 631 F.2d at 439).  Here, Plaintiffs contend that the Moving Defendants are subject to general and specific personal jurisdiction.

### 1.  Specific Personal Jurisdiction

The Sixth Circuit has "recognized that Ohio's long-arm statute is not coterminous with federal constitutional limits."  *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000) (noting that "the Ohio Supreme Court has ruled that the Ohio long-arm statute does not extend to the constitutional limits of the Due Process Clause") (citing *Goldstein v. Christiansen*, 70 Ohio St. 3d 232, 236, 1994 Ohio 229, 638 N.E.2d 541, 544 (Ohio 1994) (*per curiam*)).  "Accordingly, 'when Ohio's long-arm statute is the basis for personal jurisdiction, the personal jurisdiction analysis requires separate discussions of whether the defendant is amenable to suit under Ohio's

long-arm statute and whether due process requirements of the Constitution are met.' " *Estate of Thomson*, 545 F.3d at 361 (citing *Walker v. Concoby*, 79 F. Supp. 2d 827, 831 (N.D. Ohio 1999)).

### a. Ohio's long-arm statute

Plaintiffs argue that the Moving Defendants are subject to Section (A)(1) of Ohio's long-arm statute.  *See* Ohio Rev. Code § 2307.382(A)(1).  That section provides that "[a] court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:  (1) Transacting any business in this state[.]"  According to the Ohio Supreme Court, the "transacting any business" basis for extending jurisdiction set forth in Ohio Revised Code § 2307.382(A)(1), "is very broadly worded and permit[s] jurisdiction over nonresident defendants who are transacting any business in Ohio."  *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 53 Ohio St. 3d 73, 77 (Ohio 1990).

Plaintiffs, who are all domiciled in Connecticut, engaged an Ohio law firm to negotiate on their behalf with the defendants in this action, who were represented by a law firm located in Illinois.  Plaintiffs contend that the Moving Defendant transacted business in Ohio by negotiating, through their attorneys, the Consultant Agreement, which took place over approximately one month.  Plaintiffs rely on the Ohio Supreme Court case, *Kentucky Oaks Mall*, *supra*, for the proposition that the Moving Defendants transacted business in Ohio.  In *Kentucky Oaks Mall*, the defendant negotiated a lease by telephone with an Ohio-based limited partnership for property located in Kentucky.  The defendant signed the lease in Georgia, mailed it to Ohio, and made monthly payments to the lessor in Ohio.  The Ohio Supreme Court found that the defendant transacted business in Ohio.

Plaintiffs claim that the circumstances before this Court are analogous.  That is, Plaintiff contends that the Moving Defendants transacted business in Ohio because they "negotiat[ed] a contract" with Plaintiffs' "Ohio-based counsel; placing and receiving numerous telephone calls, emails, letters, and/or facsimiles to Ohio; signing an agreement with an Ohio forum selection clause; and mailing the signed Consultant Agreement to Ohio."[3]  (Doc. # 32 at 29.)  Plaintiffs' arguments are not well taken.

*Kentucky Oaks Mall* is distinguishable because one of the parties to the contract was an Ohio-based business and at least part of the performance of the contract was in Ohio, *i.e.*, the lease payments were sent to Ohio each month.  Whereas in the instant action, no party to the contract had any presence whatsoever in Ohio and no aspect of the performance of the contract took place in Ohio.  The business that was transacted in Ohio was between Plaintiffs and their Ohio counsel–not between Plaintiffs and the Moving Defendants.  Consequently, the Court concludes that the Moving Defendants did not transact business in Ohio.

### b. Due process

Even if the Court had determined that the Moving Defendants transacted business in Ohio, requiring them to be haled into Court in Ohio would not comport with constitutional due process.  A suit cannot be maintained where jurisdiction offends "traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. and Placement*, 326 U.S. 310, 316 (1948) ("due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he

---

[3]Plaintiffs also claim that the Moving Defendants signed a contract that had an Ohio forum selection clause.  However, as the Court determined above, the Moving Defendants specifically excepted themselves from that provision.

have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' ") (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  As to the due process inquiry for specific jurisdiction, the Sixth Circuit established in *Southern Machine Corp. v. Mohasco Industries, Inc.* a three-prong test for determining whether such jurisdiction may be exercised:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

401 F.2d 374, 381 (6th Cir. 1968).  Here, the Moving Defendants' actions do not satisfy any of the three prongs of this test.

### i.  Purposeful availment

"The purposeful availment prong of the *Southern Machine* test is essential to a finding of personal jurisdiction[.]"  *Calphalon Corp.*, 228 F.3d at 721 (citing *LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293, 1300 (6th Cir. 1989)).  As the "constitutional touchstone" of personal jurisdiction, purposeful availment exists where a defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there.  *Burger King*, 471 U.S. at 474-75 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)).  In a case where personal jurisdiction was purportedly based on a contract between the nonresident defendant and the Ohio-based business, the Sixth Circuit has explained:

> This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts.  There is a difference between what *World-Wide Volkswagen* calls a mere "collateral relation to the forum State," and the kind of substantial relationship with the forum state that invokes, by design, "the benefits and protections of its laws."

An understanding of this difference is important to the proper application of the "purposeful availment" test.

The Supreme Court has emphasized, with respect to interstate contractual obligations, that "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequence of their activities."

*Calphalon Corp.*, 228 F.3d at 721-22 (citing *Burger King*, 471 U.S. 462, *World-Wide Volkswagen*, 444 U.S. 286, and *Hanson v. Denckla*, 357 U.S. 235 (1958)).

In the instant action, Plaintiffs' argue that the Moving "Defendants purposely availed themselves of the state by negotiating a contract with Plaintiffs' counsel in Ohio, sending the signed contract to Ohio to effectuate the agreement, and by signing a contract which contained an Ohio forum selection clause."  (Doc. # 32 at 36.)  Plaintiffs' arguments are not well taken.

The Moving Defendants did not reach out beyond the states in which they conduct business to create continuing relationships and obligations with citizens of Ohio.  Nor did the Moving Defendants create the kind of substantial relationship with Ohio that invokes, by design, the benefits and protections of its laws.  Indeed, the Moving Defendants have merely a collateral relationship with Ohio similar to the one at issue *Kerry Steel Inc. v. Paragon Industries, Inc.*, 106 F.3d 147, 151 (6th Cir. 1997) and in *International Technologies Consultants v. Euroglas*, 107 F.3d 386, 395 (6th Cir. 1997).  In *Kerry Steel* the Sixth Circuit "held that an out-of-state defendant-buyer did not purposefully avail itself of the benefits and protections of the forum state's laws because, in part, no facts connected the subject matter or performance of the contract at issue to the forum state."  *Calphalon Corp.*, 228 F.3d at 722 (explaining the holding in *Kerry Steel*).  In *International Technologies Consultants*, the court found it "purely fortuitous" that the foreign defendant-seller had any contact with Michigan, stating that the defendant was not

19

attempting to "exploit any market for its products" in the state of Michigan, but rather had contact with the state only because the plaintiff chose to reside there. Here, like in *Kerry Steel*, no facts connect the subject matter or performance of the contract at issue to Ohio and, like in *International Technologies Consultants*, the performance of the Consultant Agreement was not focused on exploiting any market in the state of Ohio.

Further, the Moving Defendants' telephone, mail, and facsimile contact with Plaintiffs' counsel in Ohio occurred solely because counsel was located in Ohio, not because the Moving Defendants sought to further its business and create continuous and substantial consequences there. *See Calphalon Corp.*, 228 F.3d at 723 (the defendant's "phone, mail, and fax contact with [the plaintiff] in Ohio and [the defendant]'s physical visits there occurred solely because [the plaintiff] chose to be headquartered in Ohio, not because [the defendant sought to further its business and create 'continuous and substantial' consequences there"). Finally, the Moving Defendants specifically excepted themselves from the forum selection clause upon which Plaintiffs' rely, which provides more support for the Moving Defendants' argument that they did not purposely avail themselves to the benefits of doing business in Ohio. Indeed, just the opposite.

Accordingly, the Court finds that the Moving Defendants' relationship to Ohio was too attenuated to constitute purposeful availment.

### ii. Arising from and reasonableness

Even if the Court had determined that the Moving Defendants had purposely availed themselves to the benefits of the laws of Ohio, this Court would still be unable to exercise personal jurisdiction over these defendants because their actions do not satisfy the second or

third elements of the *Southern Machine* test.  Under the second *Southern Machine* prong, the claim for relief must arise out of the Moving Defendants' activities in the forum.  *See Southern Mach.*, 401 F.2 at 381.  A claim for relief can be of whatever type, as long as it has "a substantial connection with the defendant's in-state activities."  *Id.* at 384 n.27.  "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contact."  *Id.* at 384 n.29 (citations omitted).  The Sixth Circuit has also stated that a "lenient standard . . . applies when evaluating the arising from criterion."  *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002).  Even under this lenient standard, however, the operative facts of the controversy here are not related to the Moving Defendants' contact with the state of Ohio.  That is, the parties do not claim that the contract itself was fraudulently induced in some way–and therefore arising from the Moving Defendants' contact with Ohio–but rather that the contract was breached in its performance, which occurred outside of Ohio.  Therefore, the cause of action does not arise from the Moving Defendants' contact with Ohio

The third prong of the *Southern Machine* test is also not met because the acts of the Moving Defendants or the consequences caused by those acts do not have a substantial enough connection with Ohio to make the exercise of jurisdiction over them reasonable.  *See Southern Mach.*, 401 F.2 at 381.  The operative facts at issue, *i.e.*, the breach of the Consultant Agreement, did not occur in Ohio, nor were the consequences of the breach substantially connected to Ohio.  The Moving Defendants' performance of the terms of the Consultant Agreement and any earning of commissions by Plaintiffs pursuant to the Agreement occurred outside of Ohio.  Consequently, the Moving Defendants' contact with Ohio and the consequences of their acts do

not have a substantial enough connection with Ohio to make the exercise of jurisdiction over them reasonable.

### iii.  Conclusion of specific personal jurisdiction

Based on the foregoing, the Court concludes that the exercise of specific personal jurisdiction over the Moving Defendants would offend traditional notions of fair play and substantial justice.

### 2.  General Personal Jurisdiction

Plaintiffs also contend that this Court may properly exercise general personal jurisdiction over the Moving Defendants.  The courts in this District are split on whether general personal jurisdiction is available under Ohio law.  *Compare Kinda Wood USA, LLC v. MGV Enters. LLC*, No. 2:07-cv-1137, 2008 U.S. Dist. LEXIS 75699, at *24 (Judge Sargus) (defendants do not have the "kind of 'continuous and systematic' conduct required to support general personal jurisdiction over" them), *Paglioni & Assocs. v. WinnerComm, Inc.*, No. 2:06-cv-00276, 2007 U.S. Dist. LEXIS 18612, at *10 (S.D. Ohio March 16, 2007) (Judge Graham) ("These five contacts are insufficient to support general personal jurisdiction over WinnerComm."), and *Pierson v. St. Bonaventure Univ.*, No. 2:05 CV 0581, 2006 U.S. Dist. LEXIS 4662, 2006 WL 181988 (S.D. Ohio Jan. 23, 2006) (Judge Smith) ("Although there are a smattering of lower court decisions which have expressed the view that Ohio does not recognize the concept of 'general jurisdiction' over an out-of-state defendant, the Courts of Appeals held otherwise.") *with Projects Unlimited, Inc. v. All Tech Elecs., Inc.*, No. 3:09-cv-284, 2009 U.S. Dist. LEXIS 123640, at *4 (S.D. Ohio December 7, 2009) (Magistrate Judge Merz) ("The Court adheres to its prior ruling and determines that it cannot exercise general personal jurisdiction over All Tech on

the basis of the Ohio long-arm statute because that statute does not authorize general personal jurisdiction."), *NCR Corp. v. PC Connection, Inc.*, 384 F. Supp.2d 1152, 1157 (S.D. Ohio 2005) (Judge Rose) ("this Court will defer to its previous interpretations of the Ohio long-arm statute, finding no general personal jurisdiction"), and *MacDonald v. Navistar Int'l Transp. Corp.*, 143 F. Supp 2d 918, 923 (S.D. Ohio 2001) (Judge Rice) ("However, even though the due process clause allows for general jurisdiction, Ohio's long-arm statute precludes general personal jurisdiction in this forum"). This Court, however, need not determine this issue because even if general jurisdiction were available, it does not comport with constitutional due process to subject any of the Moving Defendants to it.

Unlike the specific jurisdiction inquiry, which focuses on the relationship between the defendant's contact with the forum state and the claims for relief asserted by the plaintiff, "general jurisdiction exists when a defendant has 'continuous and systematic contacts with the forum state sufficient to justify the State's judicial power with respect to any and all claims.' " *Aristech Chem. Intern. v. Acrylic Fabricators*, 138 F.3d 624, 627 (6th Cir. 1998) (quoting *Kerry Steel*, 106 F.3d at 149). *See also Helicopteros Nacionales de Columbia v. Hall*, 466 U.S. 408 (1984). Unlike the type of "minimum contacts" analysis used in the specific jurisdiction inquiry, a finding of general jurisdiction involves "a more stringent minimum contacts test," *Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996), and "[t]he standard for establishing general jurisdiction is 'fairly high,' *Brand v. Menlove Dodge*, 796 F.2d 1070, 1073 (9th Cir. 1986), and requires that the defendant's contacts be of the sort that approximate physical presence." *Bancroft & Masters, Inc. v. Augusta National, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000) *overruled in part on other grounds by Yahoo! Inc. v. La Ligue Contre*

*Le Racisme Et LAntisemitisme*, 433 F.3d 1199 (9th Cir. 2006) (*en banc*). *See also Bird*, 289 F.3d at 874 (citing *Bancroft* with approval of the "approximate physical presence" language). Because of this relatively high standard, the plaintiff's burden of making a showing of contacts sufficient to satisfy the general jurisdiction requirement has been described as "difficult." *Southern Systems, Inc. v. Torrid Oven, Ltd.*, 58 F. Supp. 2d 843, 848 (W.D. Tenn. 1999).

In the case instant action, the Court easily disposes of the question of whether Unity, MarcTec, and the Bonutti Trust have continuous and systematic contact with Ohio because these three entities have no contacts at all with Ohio. There is no dispute that all three are Illinois entities that have no employees in Ohio, own no property in Ohio, and conduct no business in Ohio. Further, the Court has already determined that they are not subject to jurisdiction based upon the theory that they are third party beneficiaries to the Consultant Agreement, closely related to BRI, or that they are subject to jurisdiction based upon the alter ego doctrine.

To support its claims that general jurisdiction exists as to JAS, Plaintiffs rely on the following contacts between JAS and Ohio: JAS contracts with three independent contractor distributor groups in Ohio which sell JAS products in Ohio, through Ohio sales entities including Ohio workers' compensation, that account for 3 to 5% (over $300,000) of JAS's total sales; a JAS sales manager is assigned to travel to Ohio bi-annually, which resulted in three visits in 2008, 2009, and 2010, and in 2006 JAS had one employee in Ohio; JAS has health care participation agreements with six Ohio entities; and JAS maintains a website that allows users to purchase products directly from the website.

JAS argues that it these contacts are not substantial enough to constitute "continuous and systematic" as that term has been defined in the Sixth Circuit. The case relied upon by JAS,

24

*Conti v. Pneumatic Prods. Corp.*, 977 F.2d 978 (6th Cir. 1992), is instructive to the facts before

the Court.  In *Conti*, the Sixth Circuit found that the plaintiff failed to establish a *prima facie*

case of general personal jurisdiction over the defendant, explaining:

> [Defendant] Pneumatic is not licensed to do business in Ohio, does not maintain an
> office or employees in Ohio, and does not own any property in Ohio.  Pneumatic
> sells its products all over the United States.  Sales are made either to distributors for
> resale or directly by Pneumatic to the end user.  Pneumatic sells its products in Ohio
> through two distributors.  These distributors act as Pneumatic's agents in connection
> with Pneumatic's direct sales to end users; and, they regularly purchase Pneumatic
> products for resale in Ohio.  The annual sales of one of these distributors to Ohio
> customers total approximately $ 900,000.  The distributors themselves usually
> service the products they sell.  On occasion, they are visited and telephoned by
> Pneumatic employees for technical support.  [Plaintiff] Conti has not established a
> *prima facie* case that Pneumatic's contacts with Ohio are of a "continuous and
> systematic" nature such that Ohio could constitutionally maintain general jurisdiction
> over Pneumatic or [defendant] McCurry in an action unrelated to its Ohio contacts.
> *Cf. Third Nat'l. Bank*, 882 F.2d at 1088-89.  *But cf. Michigan Nat'l. Bank v. Quality
> Dinette, Inc.*, 888 F.2d 462, 465-67 (6th Cir. 1989).

*Id.* at 981.

Similar to the contacts of the defendant in *Conti*, JAS's contacts are not of a continuous

and systematic nature such that Ohio could constitutionally maintain general jurisdiction over

JAS in an action unrelated to its Ohio contacts.  That is, JAS does not maintain an office in Ohio,

is not licensed to do business in Ohio, has no current employees in Ohio, and owns no real

property in Ohio.  Further, JAS has no Ohio bank account and does not direct its business

operations from Ohio.  *See Bird*, 289 F.3d at 874 (finding that defendant had not established a

"continuous and systemic" presence in Ohio when defendant did not have an office in Ohio, a

license to conduct business in Ohio, an Ohio bank account, property in Ohio, and did not direct

its business operations from Ohio).  Moreover, as JAS correctly notes, courts regularly find that

a small percent of sales, such as 3%, is not sufficient to establish general personal jurisdiction.

25

*See Harris v. Lloyds TSP Bank, PLC*, 281 F. App'x 489, 494 (6th Cir. 2008) (less than 1% insufficient); *Davis v. PNGI Charles Town Gaming, LLC*, No. 07-2352, 2007 U.S. Dist. LEXIS 94381, *9-10 (E.D. Pa.) (14-17% of defendant's customers in forum state insufficient to establish general jurisdiction); *Romann v. Geissenberger Mfg. Corp.*, 865 F. Supp. 255, 261 (E.D. Pa. 1994) (finding no general jurisdiction where defendant's contacts with the forum state constituted 2-4 % of total sales); *Wims v. Beach Terrace Motor Inn, Inc.*, 759 F. Supp. 264, 269-70 (E.D. Pa. 1991) (25-27% of guests forum state residents insufficient to establish general jurisdiction); *Ware v. Ball Plastic Container Corp.*, 432 F. Supp.2d 434, 438 (D. Del. 2006) (3% of annual total production in forum state insufficient to establish general jurisdiction); and *Simplicity, Inc. v. MTS Prods.*, No. 05-3008, 2006 U.S. Dist. LEXIS 17626, *15 (E.D. Pa.) (less than 5% of total sales "falls substantially below" standard of continuous and systematic contacts).

Additionally, the fact that JAS maintains a website accessible to Ohio citizens and had one employee in Ohio five or six years ago does not tip the scales in favor of exercising general personal jurisdiction over JAS.  *See Bird*, 289 F.3d at 874 ("Furthermore, the fact that [defendant] Dotster maintains a website [along with nearly 5,000 Ohio residents having registered domain names with the defendant] that is accessible to anyone over the Internet is insufficient to justify general jurisdiction."); *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569-70 (2d Cir. 1996) (court should consider a defendant's contacts with the forum state at time lawsuit was filed and within reasonable period prior to filing the lawsuit).

Finally, the Court notes that although JAS, in the Moving Defendants' Motion to Dismiss, made the argument that JAS is not subject to general personal jurisdiction and relied on

many of the cases to which the Court cites above, Plaintiffs failed to distinguish, or even to attempt to distinguish, any of these cases.  Nor do Plaintiffs direct the Court's attention to any case, not one, that supports their argument that haling JAS to Court in Ohio based upon general jurisdiction comports with constitutional due process.  Notwithstanding, the Court believes that this case presents a close call; however, the Court finds that Plaintiffs failed to meet their burden of establishing that JAS is subject to general personal jurisdiction in Ohio.  While it is true that Plaintiffs need only establish a *prima facie* case of jurisdiction, the *prima facie* standard has lost some of its significance here because Plaintiffs have received all of the discovery they sought with respect to personal jurisdiction and there is no real dispute over the facts relating to jurisdiction, making an evidentiary hearing unnecessary.  *See Int'l Tech. Consultants, Inc.*, 107 F.3d at 391.  The Court is satisfied that haling JAS into court in Ohio on a dispute that is unrelated to any contact JAS has with Ohio would offend traditional notions of fair play and substantial justice.  *See Int'l Shoe*, 326 U.S. at 316.

With regard to Dr. Bonutti, Plaintiffs rely upon a number of minor and outdated connections to Ohio that, together, are not nearly substantial enough to constitute continuous and systematic.  Specifically, Dr. Bonutti attended medical school in Cincinnati and lived in Ohio for approximately six years over twenty years ago; he maintains a medical license in Ohio but does not practice medicine there; he visits Ohio less than annually for presentations at the Cleveland Clinic and once in 2010 he discussed research matters with individuals there; he had a patent attorney in Ohio until 2002; he had an investment account in Ohio until 2002 and filed two lawsuits in Ohio related to that account in 2006 and 2007; and he made $15,000 in charitable contributions to Ohio persons/entities.

27

Taken together, these contacts are not of the quality that approximate physical presence. *See e.g.,* Good v. Presbyterian Hosp. in New York, 1993 U.S. Dist. LEXIS 5477, 1993 WL 131451, at*5 (E. D. Pa. April 27, 1993) (no general jurisdiction over physician who was licensed in Pennsylvania, owned residential property there, and had not practiced there five years prior to the incident at issue) and *Ghanem v. Kay*, 624 F. Supp. 23, 25 (D. D.C. 1984) ("it is the actual practice of a profession . . . and not the possession of the right to practice that brings a person within the jurisdiction" of the forum state) (citation omitted).

The Court again notes that, similar to its general personal jurisdiction analysis related to JAS, Plaintiffs failed to distinguish, or even to attempt to distinguish, any of the cases relied upon by the Moving Defendants or to direct the Court's attention to any case that supported Plaintiffs' argument that haling Dr. Bonutti into Court in Ohio based upon general jurisdiction comports with constitutional due process. The Court is satisfied that haling Dr. Bonutti into court in Ohio on a dispute that is unrelated to any contact Dr. Bonutti has with Ohio would offend traditional notions of fair play and substantial justice. *See Int'l Shoe*, 326 U.S. at 316.

## IV.  Conclusion

Based on the foregoing, the Court **GRANTS** the Moving Defendants' Motion to Dismiss. (Doc. # 11.)  The Court hereby **DISMISSES** from this action Defendants Peter M. Bonutti, M.D., Unity Ultrasonic Fixation, LLC, the Bonutti 2003 Trust, Joint Active Systems, Inc., and MarcTec, LLC.

**IT IS SO ORDERED.**

> **/s/ Gregory L. Frost**
> **GREGORY L. FROST**
> **UNITED STATES DISTRICT JUDGE**